463 F.2d 603
 William COUSINS et al., Plaintiffs-Appellees,
v.
Paul T. WIGODA, individually and on behalf of all other duly
elected, challenged and uncommitted delegates and alternates
to the 1972 Democratic National Convention from the 1st,
2nd, 3rd, 5th, 7th, 8th, 9th and 11th Illinois Congressional
Districts similarly situated, Defendant-Appellant.
 No. 72-1455.
 United States Court of Appeals,
 Seventh Circuit.
 Argued and Decided June 29, 1972.
Opinion June 30, 1972.
 
 Jerome H. Torshen, Lawrence H. Eiger, Chicago, Ill., for defendant-appellant.
 Mary Lee C. Leahy, Chicago, Ill., for plaintiffs-appellees.
 Before CUMMINGS, PELL and STEVENS, Circuit Judges.
 PER CURIAM.
 
 
 1
 At the conclusion of oral argument on June 29, 1972, this court entered an order vacating the injunction issued by the district court on June 9, 1972. This memorandum will briefly summarize the proceedings and the basis for our conclusion that the injunction had been improvidently entered.
 
 I.
 
 2
 This litigation was commenced on May 3, 1972, when plaintiffs, to whom we will sometimes refer as "Cousins, et al.," filed their complaint in the United States District Court for the Northern District of Illinois. The material facts are as follows:
 
 
 3
 On April 18, 1972, the Secretary of State of the State of Illinois proclaimed that defendant Wigoda and certain other persons (hereinafter sometimes referred to as "Wigoda, et al.") had been duly elected as delegates to the 1972 Democratic Convention. The complaint alleged that Wigoda represented a class of delegates and alternates from eight specific Illinois congressional districts.
 
 
 4
 Cousins, et al., are residents of Cook County, who on March 31, 1972, filed with the Credentials Committee of the Convention a notice of intent to challenge the seating of Wigoda, et al., at the Convention. On April 6, 1972, plaintiffs filed a statement of grounds for the challenge alleging, in substance, that defendant Wigoda and members of his group had been selected as delegates in violation of the Rules of the National Democratic Party. Neither the challenge nor the complaint before us charged that there had been any violation of the Illinois Election Code or that any question as to the eligibility of Wigoda, et al., had been raised before the election was conducted.
 
 
 5
 On April 19, 1972, the day after the Secretary of State certified the results of the Illinois election, defendant Wigoda filed a complaint for injunction and other relief and a motion for preliminary injunction in the Circuit Court of Cook County. That complaint (hereinafter "the state complaint") alleged in detail that Wigoda, et al., had complied with the various provisions of the Illinois Election Code pertaining to the election of delegates to the Convention, described the filing of the challenges and statement of grounds with the Credentials Committee of the Convention, and alleged that the challenge, if successful, would interfere with Wigoda's right to serve as a delegate and undermine the results of an election lawfully conducted in compliance with Illinois law. The state complaint prayed for a judgment declaring that Wigoda, et al., had been duly elected and were therefore entitled to be seated at the Convention and to fully participate therein. The state complaint further prayed: "That defendants be enjoined from taking any action, the purpose, intent or effect of which would be to interfere with or impede the functioning of plaintiff and the delegates and alternates in their duly elected office." After filing the state complaint on April 19, Wigoda's counsel notified Cousins, et al., that a motion for a preliminary injunction would be presented before Judge O'Brien on April 21 at 10:00 o'clock A.M.
 
 
 6
 On April 20 the Cousins group removed the state litigation to the federal court. Wigoda then moved in the federal court for an order remanding the case to the Circuit Court of Cook County. That motion was taken under advisement and finally granted on May 18, 1972. However, on that date the district judge stayed the remand for ten days to permit review by this court. We extended the stay in order to receive briefs from the parties; on June 7 we terminated the stay, finding that "the probability of a successful appeal is minimal."
 
 
 7
 Meanwhile, as already noted, the federal complaint was filed on May 3, 1972. In that complaint Cousins, et al., described the challenge which they had filed with the Credentials Committee of the Democratic Convention and the state complaint filed on behalf of Wigoda, et al. They further alleged that they were preparing to hold political meetings and caucuses within the City of Chicago to select persons, pursuant to the Rules of the Democratic Party, to represent Democrats from the City of Chicago at the 1972 Convention; that the state complaint was "frivolous as a matter of law," but nevertheless the threat of a circuit court injunction "discourages persons from participating in the political meetings and processes" which are being carried on for the purpose of challenging the elected delegates and selecting substitutes.
 
 
 8
 On May 25, 1972, Judge McGarr entered a temporary restraining order. He found that to the extent that the state complaint sought to prevent the Cousins group from going forward with their challenges under the Democratic Party Rules or from speaking, meeting, or preparing to seek recognition of an alternate slate of delegates, it sought an unsupportable interference with Cousins, et al.'s constitutionally protected rights, and must be construed to be on its face indicative of sufficient bad faith and harassment to warrant the intervention of the federal court.
 
 
 9
 On June 9, 1972, the court conducted a hearing on the Cousins motion for preliminary injunction. The plaintiffs presented three witnesses: Witness Bode described the development of certain socalled "reform rules" of the Democratic National Convention. Witness Singer described the progress of the challenge before the Credentials Committee and the adverse effect of a possible injunction. Witness Barbara Hillman testified that her husband had expressed concern about her and her sister's involvement because of a possible injunction. The district court then reaffirmed the findings which it had made on May 25, 1972, in support of the temporary restraining order, and stated that the evidence heard on June 9 established that the pendency of a prayer for injunctive relief in the state complaint "does have something of a chilling effect on the caucusing and other described activities of the plaintiffs in connection with their challenge to the elected delegates." He found that to the extent that the state complaint sought injunctive relief it was brought "in bad faith," although he expressly disclaimed any intent to accuse counsel for Wigoda of improper conduct. The conclusion was predicated on the court's opinion that the state complaint's request for injunctive relief was "unsupportable" and had "no likelihood of success."
 
 
 10
 In his injunction order the district judge expressly allowed Wigoda, et al., to pursue that aspect of the state case requesting a declaratory judgment, but the court restrained Wigoda from interfering with the challenge or the selection of an alternative set of delegates and alternates.
 
 
 11
 It is that order from which Wigoda, et al., have appealed and which we have vacated.
 
 II.
 
 12
 Although a federal court has power to grant an injunction to stay litigation in a state court, Mitchum v. Foster, 407 U.S. 225, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972), "principles of equity, comity, and federalism" dictate restraint in the responsible exercise of that power. Id. at 243, 92 S.Ct. at 2162. The underlying policy was described by Mr. Justice Black in Younger v. Harris, as "a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." 401 U.S. 37, 44, 91 S.Ct. 746, 750, 27 L.Ed.2d 669.
 
 
 13
 Although those considerations may be less compelling when the state litigation is civil rather than criminal, see Younger v. Harris, 401 U.S. at 55, note 2, 91 S.Ct. 746 (Mr. Justice Stewart concurring), they require special respect for the state judicial process if federal jurisdiction is not invoked until after state litigation is commenced. Cases such as Wisconsin v. Constantineau, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515, in which no state litigation had been commenced, or was even threatened, did not involve the same potential conflict between courts of overlapping jurisdiction.
 
 
 14
 There are valid reasons why the courts of Illinois may properly assume jurisdiction over some aspects of the controversy between Cousins and Wigoda. In the state complaint Wigoda has alleged full compliance with the provisions of the Illinois Election Code; Cousins has not yet disputed those allegations, but retains the right to do so. Moreover, assuming vacancies in the slate of delegates may occur, by death, resignation, or by the successful prosecution of one or more challenges before the Credentials Committee of the National Convention, Illinois law may control, or may affect, the manner of selecting substitutes or alternates.[1] Indeed, the Rules of the National Convention contemplate reference to state law in connection with various issues.[2]
 
 
 15
 Cousins, et al., argue that the underlying issue is what forum--the Illinois courts or the National Convention--should decide the merits of (a) their challenge, and (b) their right to serve as substitute delegates. Neither side suggests, however, that the issues should be resolved in a federal forum, or at least in a federal district court which does not have jurisdiction of the Convention or its Credentials Committee.[3] It is perfectly clear, therefore, that the entire controversy cannot be resolved in the United States District Court for the Northern District of Illinois.
 
 
 16
 To what extent the courts of Illinois must defer to the Credentials Committee, and conversely to what extent the Credentials Committee should defer to the law of Illinois in selecting delegates to represent that state, are matters which were not raised or argued in the court below. In our view these basic and underlying issues must be developed in an orderly fashion in either or both of the two fora which do have an appropriate part to play in resolving the dispute between the parties. Thus, when Cousins, et al., filed their complaint in the federal district court, there was pending in the courts of Illinois litigation in which state law issues were properly raised. The question presented to the district court was whether, having a due regard for the principles of comity which must govern the relationship between federal and state tribunals, a showing of such threatened irreparable injury to federally protected rights had been made as to require the extraordinary relief of entering an injunction which would inevitably interfere with the orderly progress of pending litigation.
 
 
 17
 The showing made by Cousins, et al., was in two parts. They contend that the prayer for relief in Wigoda's state complaint was overly broad and patently frivolous. They therefore argue, first, that if the state court should grant the complete relief for which Wigoda prayed in his state complaint, their vital First Amendment rights would be abridged; and second, that the mere pendency of a complaint containing such a broad prayer for relief had an immediate "chilling effect" on the exercise of those rights. The district court relied primarily on the first contention, but also, after hearing evidence, found that the complaint itself "does have something of a chilling effect." We consider the two bases for federal intervention in state litigation separately.
 
 
 18
 First: Plaintiffs have not alleged or attempted to prove that they will not receive a fair trial in the courts of Illinois, or that the state judicial system will not fully honor and protect their constitutional rights. If, therefore, they are correct in construing the prayer for relief as frivolous and overly broad, we cannot presume that such relief would be granted by an Illinois chancellor, or if granted would be sustained on direct review. Unless some showing is made to the contrary, we must assume that an Illinois court would properly determine the merits of any federal issue properly presented to it. The mere possibility, unsupported by allegation or evidence, that a state judge might make a flagrantly erroneous ruling on a federal issue is an insufficient basis for federal intervention in the orderly progress of state litigation.
 
 
 19
 On the other hand, if the prayer for injunctive relief in the state complaint is not entirely frivolous, and there is some area in which state interests require vindication, the ability of the state tribunal to appraise the issues fairly and to fashion the appropriate relief must certainly be impaired by an outstanding federal order which broadly provides that a state chancellor may go thus far and no farther. The validity of constitutional contentions often turns on a precise delineation of the relevant facts and applicable provisions of state law. Inevitably, the district court's partial stay of the proceedings in the state court will impair the orderly definition and decision of the relevant issues.
 
 
 20
 We recognize that the time available for appellate review of any order which may be entered by an Illinois chancellor is now extremely limited, since the Convention will soon convene. More time would have been available if Cousins, et al., had mounted their attack before the Illinois election was held in March, or if they had met the state complaint when it was filed on April 18, 1972. The delay in the proceedings since that date cannot be charged to Wigoda, et al. But even if there had been no delay our responsibility to approve or disapprove of the injunctive order entered by the court below must be based on the record made in that court before the order was entered.
 
 
 21
 Thus, assuming without deciding that the state complaint contains a frivolous and overly broad prayer for relief which, if granted in haec verba, would impair the First Amendment rights of Cousins, et al., we hold that the mere existence of such a possibility does not justify a federal court's entry of an order effectively excising that prayer from the state complaint. The partial stay of the state proceeding cannot be supported by mere speculation that an Illinois chancellor might commit flagrant error. The principles of comity and federalism which the Supreme Court has repeatedly emphasized demand a higher respect for the state judiciary.
 
 
 22
 Second: Cousins, et al., argue that even if the Illinois courts will not grant overly broad relief, the mere pendency of a frivolous claim evidences "bad faith," "harassment," and has a "chilling effect" on the exercise of their First Amendment rights. We are unpersuaded by this argument.
 
 
 23
 The district court did not stay the entire state proceeding. He assumed. as do we, that the entire proceeding was not initiated in bad faith and is not frivolous. The objection is to only a portion of the prayer for relief. Assuming that such portion is frivolous and overly broad, that mere fact is insufficient to support a finding of harassment or bad faith. We need not approve the accepted practice of lawyers who routinely include excessive prayers in their pleadings to hold that such legal draftsmanship is not the kind of conduct which the Supreme Court described as "bad faith" or "harassment" in Dombrowski v. Pfister, 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22. The district court order clearly cannot be supported by a finding of bad faith or harassment.
 
 
 24
 Cousins, et al., argue, however, that such findings are unnecessary if they establish a "chilling effect" on their First Amendment rights and consequent irreparable injury. We find the evidence of such "chilling effect" singularly unpersuasive, and we find no evidentiary basis whatsoever for a finding of irreparable injury. The district court's tentative statement that the evidence discloses "something of a chilling effect" interpreted the record liberally in plaintiffs' favor. That ambiguous finding is, in our view, inadequate to justify federal intervention in state litigation. Moreover, the actual evidence of a chilling effect falls far short of the kind of showing made in Dombrowski, supra.
 
 
 25
 Plaintiffs' evidence showed no impairment whatever of their conduct of challenges to Wigoda, et al., before the Credentials Committee of the Convention; nor did it disclose any restraint on their right to assemble and to speak out in favor of the selection of an alternate slate of delegates. Most liberally construed, the evidence merely indicated some reluctance by third parties to rally to the Cousins cause because of concern that the entire effort might be aborted. But such evidence related to the persuasive impact of the arguments advanced by Cousins, et al.; it did not prove any impairment of their right to assemble or to speak out publicly. We find it anomalous that the Cousins group, which includes experienced lawyers and persons who hold themselves out as qualified to represent the State of Illinois in the robust political controversies which a National Party Convention must resolve, should contend that the mere pendency of an unanswered complaint containing an overly broad prayer for relief has a significant "chilling effect" on the exercise of their First Amendment rights. Had the district court made an unequivocal finding to that effect on the evidence that was actually presented to him, we have no doubt that such a finding would have been clearly erroneous.
 
 
 26
 Plaintiffs clearly failed to establish the kind of irreparable harm which may, in exceptional cases justify a federal district court's entry of an order restraining the orderly prosecution of state litigation already on file.
 
 
 27
 PELL, Circuit Judge (dissenting).
 
 
 28
 I respectfully dissent from the order entered by the majority of the panel from the bench on June 29, 1972, which order vacated the preliminary injunction entered by the district court.
 
 
 29
 This court has a very limited scope of review in an appeal from the granting of a preliminary injunction. The sole issue is whether the district court abused its discretion.[1]
 
 
 30
 I would hold that the district court did not abuse its discretion.
 
 
 31
 The question before us is not how we might have decided the issues before the district court as a de novo matter but we should only look at the merits to the extent necessary to determine whether the district court abused its discretion.[2]
 
 
 32
 This court is not permitted to substitute its opinion for the finding of the district court where the record furnishes a reasonable basis for the finding and action of the district court.[3]
 
 
 33
 To justify an interlocutory injunction it is not necessary that the plaintiffs' right to a final decision, after a trial, be absolutely certain or wholly without doubt.[4]
 
 
 34
 "This limited review is necessitated because the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief. Weighing these considerations is the responsibility of the district judge; only a clear abuse of his discretion will justify appellate reversal."[5]
 
 
 35
 The balancing processes here involved are the traditional function of the equity, not appellate, court.[6]
 
 
 36
 Indeed, it has been stated that the appellate court's ruling in this particular review situation may not be invoked as res judicata nor will it become the law of the case.[7]
 
 
 37
 When the preliminary injunction has been issued to preserve the status quo, pending a determination on the merits, it is not necessary that the trial court find the certainty of a wrong, a likelihood is sufficient.[8]
 
 
 38
 Additional background matter should be observed. Until a very few days ago, uncertainty existed as to whether the anti-injunction statute (28 U.S.C. Sec. 2283) barred a civil rights action (42 U.S.C. Sec. 1983) to enjoin civil proceedings in a state court. The Supreme Court held on June 19, 1972, that it did not.[9]
 
 
 39
 Further, it appears that the thrust of the cases sometimes categorized as the Younger v. Harris[10] decisions is that the federal courts will refrain from inhibiting action directed toward pending state criminal proceedings.
 
 
 40
 As a final matter of background, or context within which we should consider the present appeal, generally an appellate court may set aside a trial court's exercise of discretion only if the exercise of such discretion could be said to be arbitrary or, putting it another way, discretion is abused only where no reasonable man would take the view adopted by the trial court.[11]
 
 
 41
 The ultimate merits of the lawsuit below revolve around the question of whether the determination of the qualifications and identity of delegates to the 1972 Democratic National Convention is governed by state law, by rules of the National Democratic Party or possibly by some combination of both. It cannot be gainsaid that the national conventions of the two major political parties of this country will have a direct and extremely significant effect upon the government of this nation for the next four years. The public generally and each state, by virtue of its representation at those conventions, have a substantial interest in the composition of the national party conventions. This no doubt is also true of the various sectors of the voting populace who supposedly were assured representation by the newly adopted convention guidelines--blacks, women and the young. Meritorious arguments, on the other hand, can be advanced on behalf of delegates elected at an open election, in which anyone could (as many did) run by filing a nomination petition containing a relatively minimal number of signatures.
 
 
 42
 These merit matters, however, are not really involved in the posture of the litigation before us. We are, or should be, only concerned with whether the granting of the preliminary injunction in this particular case constituted an abuse of discretion.
 
 
 43
 Basically, the plaintiffs in the court below asserted they had rights under the First Amendment to make political speeches, to discuss with the press and to hold political meetings. They have taken steps to exercise these rights. There has been no real contention that these are not guaranteed federal rights which should be protected. The state court complaint filed by the defendants seeks an injunction. The prayer of the state court complaint is couched in terms of enjoining interference with elected delegates functioning as such. We need only look at the complaint in the federal court below to ascertain what the proposed interference is. That, in essence, is nothing more nor less than the exercise of guaranteed First Amendment rights.
 
 
 44
 I find it difficult to say a district court has been arbitrary or has abused its discretion when preliminarily enjoining pursuit of a state court action whose end purpose is to suppress the rights of freedom of speech and freedom of assembly. The mere imposition of the necessity of defending against a lawsuit seeking to suppress and put down the exercise of rights seems to me to be an impermissible chilling of those rights.
 
 
 45
 It is insufficient, it seems to me, to say that the state courts as well as the federal courts protect federal rights. There should, as a threshold matter, be no necessity for having to go into state court to defend those federal rights.
 
 
 46
 As Mr. Justice Harlan so aptly put the matter:
 
 
 47
 ". . . timing is of the essence in politics. It is almost impossible to predict the political future; and when an event occurs, it is often necessary to have one's voice heard promptly, if it is to be considered at all."[12]
 
 
 48
 We do not view matters with hindsight in considering the determination of cases. Nevertheless, it is of interest to note the sequel of the panel's action in vacating the preliminary injunction as related in the Chicago Sun-Times of June 30, 1972, as follows:
 
 
 49
 "A Circuit Court judge Thursday issued a temporary restraining order barring the Chicago challengers from seeking to take the seats of 59 Daley organization delegates to the Democratic National Convention.
 
 
 50
 "Circuit Court Judge Daniel O'Brien acted almost immediately after a three-judge federal panel dissolved an injunction that had prevented organization attorneys from seeking the order against the challengers.
 
 
 51
 "O'Brien acted in the absence of attorneys for the challengers, who had flown to Washington for a national party Credentials Committee hearing on the challenge."
 
 
 52
 Irrespective of what subsequent action the state court took, or might take, I am of the opinion that we as a reviewing court should not have determined, when viewing all of the factual circumstances including timing[13] in the light of the applicable legal context, that the district court had abused its discretion. The real likelihood of a constitutional wrong should have been sufficient to sustain the action below.
 
 
 
 [1]
 46 Smith Hurd Ill.Stat.Anno. Sec. 7-1 provides:
 "Except as herein otherwise provided, the nomination of all candidates . . for the election of . . . delegates and alternate delegates to National nominating conventions by all political parties . . . shall be made in the manner provided in this Article 7, and not otherwise." (Emphasis added.)
 Cousins, et al, argue that the Code does not provide the exclusive method of selecting delegates to represent the State of Illinois at the National Democratic Convention, but they have not identified for us the legal basis for an alternative method of selection.
 
 
 [2]
 For example, an exhibit attached to plaintiffs' complaint sets forth certain Democratic Party guidelines which state, in part, on the subject of slate-making:
 "When State law controls, the Commission requires State Parties to make all feasible efforts to repeal, amend or otherwise modify such laws to accomplish the stated purpose." (Emphasis added.)
 
 
 [3]
 Even if the final determination is to be made by the National Convention, it does not necessarily follow that the decision of state law issues by an Illinois tribunal will impair the work of the Convention. Cf., Roudebush v. Hartke, 405 U.S. 15, 26, 92 S.Ct. 804, 31 L.Ed.2d 1
 
 
 [1]
 Minnesota Mining & Mfg. Co. v. Polychrome Corp., 267 F.2d 772, 775 (7th Cir. 1959)
 
 
 [2]
 Industrial Bank of Washington v. Tobriner, 132 U.S.App.D.C. 51, 405 F.2d 1321, 1324 (D.C.Cir. 1968)
 
 
 [3]
 Mytinger & Casselberry, Inc. v. Numanna Lab Corp., 215 F.2d 382, 385 (7th Cir. 1954)
 
 
 [4]
 Mytinger, supra at 385
 
 
 [5]
 United States Steel Corp. v. Fraternal Ass'n of Steelhaul., 431 F.2d 1046 (1970)
 
 
 [6]
 Brotherhood of Locomotive Engineers v. Missouri-Kansas-Texas R. Co., 363 U.S. 528, 535 (1960)
 
 
 [7]
 Mesabi Iron Company v. Reserve Mining Company, 270 F.2d 567, 570 (8th Cir. 1959)
 
 
 [8]
 Bath Industries, Inc. v. Blot, 427 F.2d 97, 111 (7th Cir. 1970)
 
 
 [9]
 Mitchum v. Foster, 40 U.S.L.W. 4737 (1972)
 
 
 [10]
 Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971); Boyle v. Landry, 401 U.S. 77, 91 S.Ct. 758, 27 L.Ed.2d 696 (1971); Perez v. Ledesma, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971); Dyson v. Stein, 401 U.S. 200, 91 S.Ct. 769, 27 L.Ed.2d 781 (1971); and Byrne v. Karalexis, 401 U.S. 216, 91 S.Ct. 777, 27 L.Ed.2d 792 (1971)
 
 
 [11]
 Particle Data Laboratories, Inc. v. Colter Electronics, Inc., 420 F.2d 1174, 1178 (7th Cir. 1969)
 
 
 [12]
 Shuttlesworth v. City of Birmingham, 394 U.S. 147, 163, 89 S.Ct. 935, 945, 22 L.Ed.2d 162 (1968)
 
 
 [13]
 The National Democratic Convention is scheduled to commence July 10, 1972, and plaintiffs were at the time of the vacation of the order in the process of asserting their claimed rights before a committee of the National Democratic Party